UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DORTENSIA HARRIS,

                        Plaintiff,                             Case Number 20-13403

v.                                                      Honorable David M. Lawson

DETROIT ENTERTAINMENT, L.L.C.
d/b/a MOTORCITY CASINO, and
RODNEY NOEL,

                        Defendants.

_____/

## OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT

Plaintiff Dortensia Harris filed a complaint against her employer and supervisor alleging that when she was employed as a server at the MotorCity Casino, she was sexually assaulted by shift supervisor Rodney Noel. She brings claims under Title VII of the Civil Rights Act and state law. After discovery closed, the defendants moved for summary judgment. The motion is fully briefed, and oral argument will not assist in its resolution. The Court will decide the motion on the papers submitted. E.D. Mich. LR 7.1(f)(2). The record contains conflicting testimony and evidence as to whether Noel intended to touch Harris, whether doing so was outrageous, whether he was her supervisor, and whether MotorCity knew or should have known that Noel was harassing Harris and other servers. These facts issues preclude summary judgment. The motion, therefore, will be denied.

I.

The following facts come from the discovery record and the affidavits filed by the parties with their motion papers.

## A.  The Plaintiff's Employment

Plaintiff Dortensia Harris has been employed as a server at the MotorCity Casino Hotel since 1999.   Defendant Detroit Entertainment, which owns and operates MotorCity, is her employer.  Harris was hired to be a VIP Server and still holds that position today.  As a VIP Server, Harris serves drinks and food to high rollers in the casino's Signature Lounge.

Detroit Entertainment hired defendant Rodney Noel in 2012 to work in the Signature Lounge as a supervisor.  In February 2020, Noel was one of three Signature Lounge supervisors, together with Jamie Brinkman and Deborah Cureton.  Although supervisors assign tasks and issue discipline to servers, they do not set servers' schedules and cannot terminate a server directly. Instead, if a server does something to warrant termination, a supervisor calls an executive host or other manager to help them write up the server and contact the human resources department. Supervisors can also suspend a server pending a disciplinary hearing.  Supervisors report directly to the Director of Player Services, Kim Morgan, who oversees all Signature Lounge front-of-house employees, including executive hosts, who rank above supervisors in the organizational hierarchy. Morgan in turn reports to Dan Vormelker, who in 2020 was the Director or Vice President of Loyalty Marketing.  The Human Resources department is responsible for hiring servers and scheduling their shifts.   Discipline and discharge issues also are "addressed" by the HR department.

In 2019 and 2020, Harris and Noel worked overlapping shifts in the Signature Lounge. Harris worked the day shift, from 11:30 a.m. to 7:30 p.m., alongside one, two, or three other servers, depending on the time of day.  Noel worked from 2:00 p.m. to 10:00 p.m.  His shift overlapped with the other Signature Lounge supervisors' shifts.  Jamie Brinkman supervised

mornings and Deborah Cureton supervised nights.  During the overlap period, the three supervisors exercised equal supervisory authority over servers and other employees.

Because of their overlapping schedules, Harris and Noel "worked quite a bit together." They conversed often and regularly took smoking breaks.  Noel also regularly walked Harris to her car in the employee garage.  He provided similar assistance to other female employees.

### B.   The Plaintiff's Allegations

Harris alleges that at some point before April 2019, Noel began making what she describes as unwanted sexual advances.  He would tell her every day that he loved her, that he wanted her to be his wife, and that they should go into business together.  He also allegedly invited Harris to his house; told her he wanted to "taste it" — a comment she took to mean, have sex; and regularly insulted her boyfriend.  Harris testified that she did not hear Noel make similar comments to other employees and that he usually made them to her outside the earshot of others.  She further testified that Noel twice intentionally brushed his hand along her buttocks.  Harris said that she repeatedly told him that she did not wish to be groped and Noel responded that if she did not "start" he would work her harder.  Harris does not remember when Noel's inappropriate behavior began, and she never reported it to human resources or Noel's supervisors.  However, Harris stated that she eventually raised the issue with shift supervisor Jamie Brinkman, who merely replied, "Well, you know he loves you."

Harris testified that Noel punished her for rejecting his advances.  Although Noel never officially disciplined her, she stated that Noel "almost" wrote her up for telling him that she did not wish to be groped.  He made clear that she would have to work harder and do whatever he wanted on the floor — picking up every extra plate and doing every extra task — and would "stand there and watch" while she did so.  According to Harris, Noel also told other servers not to help

her complete basic tasks servers normally shared; she alleges that a server named Bridget told her that Noel forbad other servers from helping her roll up silverware.  Harris took Noel's behavior as a threat.  She believed he could "write [her] up to the point where there's no return" by putting disciplinary actions into her file that would lead human resources to terminate her.  She also believed that Noel had taken similar actions to get rid of other employees.

The last straw for Harris came on February 4, 2020.  That afternoon, Harris entered the office Noel shared with the other supervisors and the VIP chef to ask for an "early-out" — that is, to leave before the end of her shift.  This was something servers, including Harris, often did; when their request was granted, they signed a clipboard in the supervisors' office to mark the end of their shift.  Harris testified that she sat in a chair in the office to sign the clipboard when Noel reached out, grabbed her left breast, and squeezed.  According to Harris, she responded by pushing Noel's hand away, jumping out of the chair, and exclaiming, "What are you doing?!"  Noel answered by asking Harris if she wanted him to walk her out.  Shaken and upset, Harris agreed; he walked her outside, and they smoked a cigarette.   There were no witnesses and the door to the office remained closed throughout the encounter.

The next day, February 5, 2020, Harris called in sick because she was afraid to go to work.  She testified that Noel called her twice that day and that she does not remember whether she answered his calls.

When Harris returned to work on February 8, 2020 for her next scheduled shift, she asked Noel to talk in the supervisors' office.  She confronted him about the assault.  Harris secretly recorded the conversation, which proceeded as follows:

| | |
|---|---|
| Harris: | Ronnie, why did you grab my chest . . . ? |
| Noel: | Do I? |
| Harris: | Do I what? |
| Noel: | I'm sorry baby. |

| | |
|---|---|
| Harris: | Don't do that ever again, okay?  So say, "Okay and I'm sorry." |
| Noel: | I'm sorry.  I won't do it again. |
| Harris: | Okay.  I'm like, you'd have lost your mind. |
| Noel: | I'm sorry. |
| Harris: | Mm okay.  Alright.  You better be sorry. |
| Noel: | I am. |
| Harris: | What's wrong with your voice? |
| Noel: | Nothing.  It does that. |
| Harris: | Okay.  Alright. |
| Noel: | You mad at me? |
| Harris: | Yes I was.  I really was.  Yes I was.  Yes, yes, I really was. |
| Noel: | I'm sorry.  (Inaudible — perhaps, "I love you.") |
| Harris: | Okay Ronald. |
| Noel: | You don't want me to walk you out? |
| Harris: | Yeah you can.  Mmhm.  I just --- |
| Noel: | (Laughs.)  Come here.  You're my girl, you know that.  (Inaudible.)  I have the highest respect for you. |

Ans. to Mot., Ex. 7, Recording at 26:10-27:10, ECF No. 29-8 (filed traditionally).  Harris's tone of voice is playful during this exchange, while Noel's voice could be described as sheepish.  The rest of the recording, which is 90 minutes long, consists of kitchen and casino noises and unrelated conversations.

### C.  Noel's Recollection

Noel remembers his relationship with Harris differently.  He admitted that he told Harris that he loved her, but he explained that he made similar statements to everyone on his team, often telling them "everyone's hustling, doing a great job . . . you guys are beautiful, I love you, great job."  Noel Dep., ECF No. 27-8, PageID.232.  He denied ever touching Harris's buttocks or initiating any other physical contact with her, and he testified that Harris never told him that she did not want to be groped.  To the contrary, Noel stated that Harris would initiate hugs and "always" wanted him to walk her out and smoke with her, something he did "90 percent of the time."  Noel also denied ever telling Bridget or anyone else not to help Harris out, testifying that he always emphasized teamwork.  He allowed that Harris often asked for early-outs, which had

- 5 -

caused friction between them in early 2020, when she responded to a denied early-out request by calling Kim Morgan to report Noel for improperly having another server play the lottery for him.

Noel does not remember anything amiss with his interaction with Harris on February 4, 2020. However, he does remember Harris coming to his office on February 8, 2020 to ask him why he grabbed her breast. He testified that he responded, "What? Did I do that?", and that when Harris insisted he had, he apologized, saying, "I'm sorry, if I did that, I'm sorry." According to Noel, Harris replied, "Okay," and then he and Harris walked out of the casino together. Noel explained that he hangs his coat on a hook on the wall behind the chair in which Harris sat on February 4, 2020, and although he did not grab her breast and does not remember touching it, he could have brushed her chest accidentally when he reached out for his coat so that he could walk Harris to her car.

Noel admitted that he called Harris on February 5, 2020, explaining that it was unusual for her to call in sick, and both he and Jamie Brinkman wanted to check on her. Noel and Brinkman called Harris on the work cell phone supervisors shared during their shifts. Noel testified that Harris answered the phone and said she was fine but had called out because she did not feel well.

### D.   MotorCity Casino's Response

On February 10, 2020, Harris reported the assault to Noel's supervisors. She spoke first with executive host Nakishia Gibson. Gibson wrote in a voluntary statement that because Harris appeared emotional, Gibson asked to include Kim Morgan in the conversation so that Harris would not have to make the report twice. Gibson then walked Harris over to the executive host office, where Harris told Gibson and Morgan that Noel had grabbed her breast the prior Tuesday. After the meeting, Morgan immediately called the Director of Human Resources and Employee Relations, JoAnn Taylor.

Taylor met with Harris the next day.  Morgan and Vice President of Loyalty Marketing, Dan Vormelker, witnessed the meeting.  Harris repeated the allegations described above, recounting the February 4, 2020 incident, Noel's prior verbal harassment, and that Noel previously had "hit [her] on the butt."  She stated that she could not give dates for any of this conduct because it "happen[ed] all the time."

Later that day, Taylor interviewed Noel.  He denied deliberately touching Harris's breast but allowed that he may have done so unintentionally while reaching to grab his coat.  He also admitted that he told other VIP servers, male and female, that he loved him, and female servers that he wanted them to be his wife.  He explained that he did so because he wanted his team to be a family.  Taylor suspended Noel the following day pending an investigation.

Taylor conducted the investigation into Harris's allegations.  She interviewed and obtained written statements from the other VIP servers who worked with Harris — Michael Azoury, Brianna Cooks, and Deanna Horner.  Azoury and Horner stated that Harris had told them about the February 4th incident.  Azoury further reported that Harris seemed distraught and told him that Noel previously had touched her buttocks.  Horner acknowledged that Noel also had told her that he wanted her to be his wife but explained that the incident occurred four years earlier and that Noel was joking.  Cooks told Taylor that she did not believe Harris, opining that Harris had made up the allegations to retaliate against Noel for denying her early-outs.  She stated that Noel had never done or said anything inappropriate to her and that she believed him to be an excellent manager.

Taylor also interviewed and obtained written statements from Harris, Morgan, Gibson, and Noel.  She did not obtain the recording Harris made on February 8.  Harris did not know if it was legal for her to have the tape and therefore did not tell anyone about it.

On February 24, 2020, Taylor completed her investigation.  She prepared a summary for Vice President of Human Resources David Turner.  Noting that there were no witnesses to the alleged harassment, that Harris's and Noel's recollections were conflicting, and that Harris twice took smoke breaks with Noel following the incident, Taylor concluded that Noel's explanation was credible.  Nevertheless, she recommended that Noel receive a two-week suspension for engaging in inappropriate conduct by telling his female coworkers that he loved them and wanted them to be his wife.  Turner accepted Taylor's recommendation and went further, placing Noel on a Last Chance Agreement.  The agreement stated that if Noel violated any MotorCity work rule, policy, or procedure between February 27, 2020 and February 27, 2021, his employment was subject to immediate termination.

Noel returned to work at the Signature Lounge around February 27, 2020.  He was placed on a different shift so that he did not overlap with Harris and they did not interact in the weeks that followed.  However, Harris alleges that she heard that Noel intended to pull her aside to express that he was still her supervisor and that she preempted this conversation by reporting the rumor to Turner.  Soon thereafter, on March 16, 2020, MotorCity closed due to the COVID-19 pandemic and Noel was furloughed.  In March or April, steps were taken to transfer Noel from the Signature Lounge to the buffet to further separate him from Harris once the casino reopened.  However, Noel never returned to MotorCity and therefore never officially was transferred.  He testified that has no plans to seek to be rehired by Detroit Entertainment.

Meanwhile, on March 2, 2020, Harris submitted a Charge of Discrimination to the Equal Employment Commission, claiming that she had been subjected to sexual harassment on February 4, 2020.  The EEOC dismissed the charge on November 18, 2020 because it was unable to establish that a statutory violation had occurred.

Harris never was disciplined, suspended, or terminated for reporting Noel's alleged harassment. However, she testified that she lost earnings because she could not seek out and was not offered overtime — if she stayed late she would have had to interact with Noel. She also remains stressed and afraid to go work, and that she will lose her job.

Harris testified that she did not come forward before the February 4, 2020 assault because she heard that Noel previously had harassed a different server, Lakenya Wilbourn. Harris understood that Noel's harassment of Wilbourn was extreme, that the resulting stress had caused Wilbourn to lose a pregnancy, and that Wilbourn had reported the harassment to Kim Morgan, who took no action in response. Harris therefore believed that all complaints about Noel would fall on deaf ears. She also believes that MotorCity's investigation into her allegations was inadequate because Taylor did not interview Wilbourn or supervisor Deborah Cureton, whom Harris says saw Noel say inappropriate things to other servers. Morgan testified, however, that Wilbourn never reported that Noel had harassed her, including when Morgan interviewed Wilbourn as part of an investigation into unrelated complaints made about Cureton. Morgan stated that she was not aware of any other allegations of sexual harassment made against Noel. Noel likewise denies ever harassing or disciplining Wilbourn.

On January 10, 2022, Wilbourn swore in a declaration prepared for this litigation that Noel subjected her to sexual harassment by asking for sexual favors, making inappropriate comments, and slapping her buttocks against her will. She states that Noel wrote her up after she rejected his advances and that she reported the writeup to an executive host named J.P. sometime in 2019. Upon J.P.'s advice, Wilbourn states that she provided a written statement describing Noel's harassment on a union grievance form, but that no one from MotorCity ever followed up with her regarding the grievance. She also says that she spoke to Kim Morgan about the sexual harassment

during Morgan's investigation of Deborah Cureton and that Morgan similarly failed to take action. The record does not include any documentation of Wilbourn's conversation with Morgan or any other written statements Wilbourn allegedly made regarding Noel.

E. MotorCity Casino's Anti-Harassment Policy

MotorCity maintains a comprehensive non-harassment, non-discrimination, and non-retaliation policy. The policy proclaims the company's intolerance of "unlawful discrimination and harassment" of its employees and promises "a workplace free from all forms of unlawful discrimination or harassment." Employees who believe that they are the victim of harassment or discrimination are instructed to report it "immediately" to their "supervisor/manager or department head." If the complaint cannot be discussed with a supervisor, then the employee "must contact the Vice President of Human Resources." The company assures that "[c]omplaints of unlawful discrimination or harassment that are reported to management will be investigated as promptly as reasonably possible." 2012 Associate Handbook, ECF No. 27-3, PageID.146-49. A similar, earlier version of the policy in the record requires "[a]ny supervisor or manager who is made aware of a complaint regarding harassment [to] immediately report the complaint to his/her department head, the Human Resources Director or the General Manager." 1999 Sexual Harassment Policy, ECF No. 27-6, PageID.220.

Harris received a handbook containing the comprehensive policy soon after she was hired. She re-acknowledged receipt of the policy throughout her tenure as a VIP server.

In addition to its written policies, MotorCity provides regular diversity and civil rights training to its employees and non-harassment training to its supervisors and managers. Harris repeatedly completed this training, as did Noel.

Based on her testimony, it is fair to conclude that Harris was familiar with MotorCity's non-harassment policy. She acknowledged that she received the policy and agreed to become acquainted with its contents. She testified that she knew to contact the manager on duty if customers are acting inappropriately and repeatedly has done so in the past. She also previously participated in the grievance process, once as a witness in a dispute regarding her sister; once after reporting being sexually harassed and assaulted by a sous chef, which resulted in the chef's termination; and throughout her ten years of service as a union steward. Harris testified that her experience as a union steward made her less likely to report her own harassment, because it made her believe that if Noel retaliated against her by writing her up, she would lose her job and that she would not be believed unless she had an eyewitness to her assault.

### F.  Procedural History

Harris filed her amended complaint on January 13, 2021, pleading one count of sexual harassment against MotorCity Casino in violation of Title VII of the Civil Rights Act of 1964, and counts of battery and intentional infliction of emotional distress against Rodney Noel.

After discovery closed, the defendants filed their motion for summary judgment in January of this year. The defendants ask for summary judgment "on all counts of [the] Plaintiff's First Amended Complaint." After the motion fully was briefed, the case was reassigned to this Court. The motion is ready for decision on the motion papers.

### II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The party bringing the motion first must explain why the record is so settled that no genuine issues of material fact exist by "identify[ing] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). To rebut that showing, "[t]he nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 628 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). The opposing party must base that rebuttal on specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Notably, however, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251-52).

## A. Title VII Claim

Harris alleges that defendant MotorCity created a hostile work environment in violation of Title VII of the Civil Rights Act of 1964. Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e–2(a)(1). Subjecting an employee to a hostile work environment can amount to unlawful discrimination under Title VII. *Ladd v. Grand Trunk Western R.R.*, 552 F.3d 495, 500 (6th Cir. 2009). Harassment creates a hostile work environment "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).

To establish a *prima facie* hostile-work-environment claim, Harris must show: "(1) she was a member of a protected class; (2) she was subjected to unwelcomed harassment; (3) the harassment was based on sex[]; (4) the harassment created a hostile work environment; and (5) employer liability." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 411 (6th Cir. 2021) (quoting *Ladd v. Grand Trunk Western R.R.*, 552 F.3d 495, 500 (6th Cir. 2009)).  MotorCity disputes only the fifth element at this stage of the case.

An employer's liability for a hostile work environment under Title VII depends on the status of the harasser.  When the harasser is a co-corker, "the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)); *see also Wyatt*, 999 F.3d at 412.  But if the harasser is a supervisor, an employer can be strictly liable if the harassment "culminates in a tangible employment action." *Ibid.*  If there is no tangible employment action, the employer may interpose an affirmative defense by proving that it "exercised reasonable care to prevent and correct any harassing behavior," and that the plaintiff "unreasonably failed to take advantage of the preventive or corrective opportunities that" the employer provided. *Ibid.*  The employer bears the burden of proving the elements of that affirmative defense. *Burlington Indus.*, 524 U.S. at 765.

The defendants argue that MotorCity is not strictly liable for Noel's alleged actions because Noel was not Harris's supervisor, Harris did not suffer any tangible employment actions against her, and MotorCity can establish its affirmative defense as a matter of law.  "For Title VII liability purposes, the Supreme Court defines a 'supervisor' as an employee that has the power 'to take

tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Wyatt*, 999 F.3d at 412-13 (quoting *Vance*, 570 U.S. at 431).

### 1. Supervisory Liability

#### a. Noel's Supervisor Status

Genuine questions of material fact exist over whether Noel had significant authority to discipline Harris. Although the Supreme Court in *Vance* attempted to draw "a sharp line between co-workers and supervisors," 570 U.S. at 439, in certain areas there are "reason[s] to doubt just how 'clear' and 'workable' the Court's definition [of supervisor] is," *id.* at 464 (Ginsburg, J., dissenting). One of these is in the area of discipline. The Supreme Court did not include discipline when it illustratively listed the "tangible employment actions" that define supervisory authority — "*i.e.*, . . . hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 431. But it cited the Seventh Circuit as the source of its definition of "supervisor" and acknowledged that the circuit has "held that an employee is not a supervisor unless he or she has the power to hire, fire, demote, promote, transfer, *or discipline* the victim." *Id.* at 431 (citing *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011)) (emphasis added). The Supreme Court further allowed that an individual may qualify as a supervisor for purposes of Title VII liability if he or she had the ability to impose "discipline [that] had economic consequences (such as suspension without pay)." *Id.* at 438 n.9 (internal citation omitted). And it described the harasser in *Faragher v. City of Boca Raton* as a "clear" example of a supervisor because he "could hire new lifeguards, supervise their work assignments, counsel, *and discipline them*." *Id.* at 437 (citing *Faragher*, 524 U.S. 775, 781 (1998)) (emphasis added).

The parties in this case appear to agree that Noel lacked the power to hire, fire, demote, promote, or transfer VIP servers. But there is some evidence in the record from which a factfinder could infer that Noel could discipline VIP Lounge employees. Noel testified that he could "issue discipline to the servers," and he suggested that doing so was a core part of his role, stating that, "of course, as a manager, by doing our jobs, we had to take actions if we ever thought it was necessary." Noel Dep., ECF No. 27-8, PageID.231. The defendants do not rebut these statements in their motion papers, or even discuss shift supervisors' disciplinary authority. Nor did any of Noel's superiors — Kim Morgan or JoAnn Taylor — testify that Noel lacked the ability to discipline servers. Taylor merely stated in an affidavit that "discipline/discharge issues . . . are *addressed*" by the Human Resources department. Taylor Aff., ¶ 9, ECF No. 27-2, PageID.139 (emphasis added). But she never averred that discipline is the sole responsibility of HR or made any other statements precluding the possibility that disciplining servers remains within supervisors' purview. *Compare ibid.* ("Signature Lounge supervisors do not set schedules for the VIP servers . . . nor do they have the authority to hire, fire, or demote employees, or change their compensation.").

Noel himself testified that he could impose two kinds of disciplinary actions. First, he stated that he could suspend VIP Lounge servers pending a disciplinary hearing or investigation. Noel Dep., ECF No. 27-8, PageID.231. The record does not rule out the possibility that such suspensions were without pay, and therefore would carry the requisite "economic consequences." *Vance*, 570 U.S. at 438 n.9; *see also Strothers v. City of Laurel*, 895 F.3d 317, 334 (4th Cir. 2018) (finding that an individual was a supervisor in part because she had disciplinary power); *Velazquez-Perez v. Devs. Diversified Realty Corp.*, 753 F.3d 265, 272 (1st Cir. 2014) (finding that an individual was not a supervisor in part because she lacked disciplinary power).

The record sufficiently establishes a genuine issue of material fact as to whether Noel's suspensions carried direct economic consequences. If they did, Noel exercised disciplinary authority sufficient to make him a supervisor under Title VII. *Vance* leaves that door open.

Second, Noel testified that he could write up servers for conduct that warranted termination. Noel Dep., ECF No. 27-8, PageID.231. Importantly, though, Noel also testified that he could "[n]ot recommend that an employee be fired" and that supervisors "leave that decision up to the human resources department." *Ibid.* That organizational structure strongly suggests that MotorCity did not "effectively delegate[]" termination powers to Noel. *See Vance*, 570 U.S. at 447 (allowing that some employers "confine decisionmaking power to a small number of individuals" so that "those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee."); *Wyatt*, 999 F.3d at 413 (finding a fact question of whether an individual was a supervisor where his superiors "substantially relied" on his recommendations when taking employment actions). The record indicates that the opposite is true — not the least because the Human Resources department led an extensive investigation before disciplining Noel himself for the conduct at issue in this case.

Nonetheless, because Noel could impose discipline that had potential economic consequences, Harris may move forward on the theory of employer liability under the supervisor theory of liability.

b. Affirmative Defense

Although the record supports the contention that Noel was a supervisor, Harris concedes that Noel's alleged harassment did not result in MotorCity taking tangible employment action against her. Therefore, MotorCity can avoid liability at the summary judgment stage of the case

if the uncontested record establishes the elements of its affirmative defense as a matter of law. MotorCity must show both that (1) it "exercised reasonable care to prevent and correct any harassing behavior" and (2) that Harris "unreasonably failed to take advantage of the preventive or corrective opportunities" that MotorCity provided. *Vance*, 570 U.S. at 424.

### i. Reasonable Care

The first element requires proof that MotorCity had a "reasonable sexual harassment policy" and whether such policy "was effective in practice in reasonably preventing and correcting any harassing behavior." *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 349-50 (6th Cir. 2005)). Harris does not dispute that MotorCity's sexual harassment policy was reasonable on paper. Instead, she argues that MotorCity failed to enforce its own policy, including by refusing to take action in 2019 after Noel allegedly harassed Wilbourn. Although the effectiveness of the policy is close question, factual disputes preclude summary judgment.

To begin, Harris testified that two other VIP Lounge supervisors — Jamie Brinkman and Deborah Cureton — knew that Noel was harassing her prior to February 2020. She testified that Cureton witnessed harassment and that she discussed Noel's conduct with Brinkman, who excused Noel's behavior and took no further action. As noted above, there is a genuine question of material fact whether VIP Lounge supervisors qualify as supervisors for purposes of establishing Title VII liability. Because Brinkman and Cureton could be considered to be supervisors, they were required per the terms of MotorCity's sexual harassment policy to report any misconduct of which they were aware. 2012 Associate Handbook, ECF No. 27-3, PageID.148; 1999 Sexual Harassment Policy, ECF No. 27-6, PageID.220; *see also Clark*, 400 F.3d at 349 ("[A]n effective policy should at least . . . require supervisors to report incidents of sexual harassment."). When supervisors learn of harassment that they are bound to report, their employer "will not escape" vicarious liability

"*regardless* of whether the victimized employee actively complained" so long as the supervisors were "aware of the harassment but did nothing to correct it or prevent it from occurring in the future." *Ibid.* (citing *Perry v. Harris Chernin, Inc*., 126 F.3d 1010, 1014 (7th Cir. 1997)) (emphasis added). Thus, if Brinkman and Cureton saw or learned of Noel's harassment of Harris — even if Harris did not report it — "there is a real question" whether they "should have taken the first step towards prevention and correction by reporting these incidents to the relevant [MotorCity] personnel, as was directed by the [MotorCity] policy." *See id.* at 350. That question is one "for the factfinder." *Ibid.*; *see also Gallagher v. C.H. Robinson Worldwide, Inc*., 567 F.3d 263, 275 (6th Cir. 2009) (deeming employer to have notice of harassment that the plaintiff's supervisor witnessed); *Randolph v. Ohio Dep't of Youth Servs*., 453 F.3d 724, 735 (6th. Cir. 2006) (finding summary judgment improperly granted where the plaintiff's testimony indicated supervisors were aware of harassment but largely ignored it); *Baugham v. Battered Women, Inc*., 211 F. App'x 432, 439 (6th Cir. 2006) ("Evidence a supervisor knew of the harassing conduct suffices to establish constructive notice.").

Additionally, Harris argues that management failed to respond to complaints other employees made about Noel, citing complaints Lakenya Wilbourn made sometime in 2019. The record contains conflicting evidence on this point. JoAnn Taylor and Kim Morgan testified that they were not aware that Wilbourn or anyone else ever made any complaints about Noel prior to February 2020. In contrast, Wilbourn stated in her declaration that she told an executive host, J.P., and Morgan, sometime in 2019, that Noel was harassing her. Harris also testified that she was aware that Wilbourn had made those reports because Wilbourn told her about them. Although Harris did not see Noel harass Wilbourn, "a plaintiff need not even witness remarks or behavior first-hand in order to allege that the remarks or behavior contributed to" harassment. *Johnson v.*

*United Parcel Serv., Inc.*, 117 F. App'x 444, 456 (6th Cir. 2004) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999)).

Viewing the conflicting testimony in a light most favorable to Harris and drawing all reasonable inferences in her favor, a reasonable jury could find that MotorCity received prior complaints about Noel, was unresponsive to those complaints, and that its unresponsiveness constituted a failure to enforce its anti-harassment policy or to exercise care reasonably calculated to correct harassment. Noel's conduct toward other employees is relevant to whether his behavior created a hostile work environment. "[A] court should not examine each alleged incident of harassment in a vacuum" but rather view related incidents in context, including incidents that were not "directed at" the plaintiff. *Jackson*, 191 F.3d at 659-61.

Supervisors' knowledge of Noel's allegedly inappropriate conduct toward other servers is relevant to determining the effectiveness of MotorCity's sexual harassment policy. "[T]he primary purpose of Title VII is not to provide redress for harassed employees, but to avoid the harm in the first place." *Clark*, 400 F.3d at 350 (citing *Faragher*, 524 U.S. at 805-06). If, before the February 2020 investigation, MotorCity "unreasonably failed to prevent and correct" Noel's harassing conduct, then MotorCity "would not be able to satisfy prong one of the affirmative defense." *Ibid.*

The defendants say that Wilbourn's declaration should be "disregarded" because Harris did not produce it in response to their discovery request. That request asked Harris to "[i]dentify all persons who, to your knowledge, have or claim to have knowledge of any facts relevant to the claims and issues involved in this action . . . ." Resp. to Interrogatories, ¶ 10, ECF No. 31-2, PageID.464. On April 28, 2021, Harris responded that "Kenya" had knowledge of relevant facts. *Ibid.* However, she did not indicate that she had "obtained a statement in any form from any person concerning any of the allegations in the Complaint or of the damages allegedly sustained." *Id.* at

¶ 11.  Nor did she provide any such statements before the November 19, 2021 discovery deadline. On January 19, 2022 — two days before the dispositive motion deadline, and 10 days after Wilbourn made the declaration — Harris provided Wilbourn's declaration to the defendants as a supplement to her discovery responses.

The defendants appear to argue that the Court on its own should strike Wilbourn's declaration as a sanction for Harris's failure to supplement seasonably her Rule 26(a) disclosures under Rule 26(e).  But there is no evidence that Harris failed to do either.  Her Rule 26 disclosures are not in the record, and she identified Kenya — i.e., Lakenya Wilbourn — as someone with knowledge relevant to her claims.  She promptly provided the affidavit to the defendants after it was made and before they filed their motion for summary judgment, and also attached it to her opposition brief.  *See, e.g.*, *Gregg v. SBC/Ameritech*, 321 F. App'x 442, 447 (6th Cir. 2009) (finding that a district court did not abuse its discretion by relying on an affidavit authored by an individual whose name was not timely provided to the opposing party); *Counts v. Kraton Polymers, U.S. LLC*, 260 F. App'x 825, 829 (6th Cir. 2008) (discussing declarations challenged as untimely because they were filed *after* the summary judgment response brief deadline).  The declaration does not contradict but rather supplements Harris's own deposition, where she testified that Wilbourn said that Noel had harassed her.  It cannot be said, therefore, that Harris provided the affidavit in an effort to create a sham issue of fact for summary judgment.  *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006).

Even without the Wilbourn affidavit, the record establishes genuine issues of material fact as to when MotorCity had notice of Noel's harassment and whether its response was reasonable.

ii.  Failure to Report

The second element of the *Faragher-Ellerth* affirmative defense involves evaluating "how and when a plaintiff uses the company's existing corrective and protective measures" to respond to harassment. *Wyatt*, 999 F.3d at 415.  The Sixth Circuit has "held that an employee unreasonably fails to take advantage of corrective opportunities when she waits two months to report harassment." *Equal Employment Opportunity Commission v. AutoZone, Inc.*, 692 F. App'x 280, 286 (6th Cir. 2017) (collecting cases).  Although Harris did not testify with specificity as to when Noel's inappropriate behavior began, she stated that Noel was making near-constant inappropriate comments to her as early as April 2019.  Harris Dep., ECF No. 27-5, PageID.211.  Harris also plainly testified that she never reported Noel's misconduct before February 2020, even though she knew how to do so.  *See* Harris Dep., ECF No. 27-5, PageID.181-83, 191-95.

Harris attempts to justify her failure to report Noel's conduct by explaining that she feared that her reports would go unheeded.  That justification is insufficient.  As a general matter, "'an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment,'" nor does her "dissatisfaction with the investigation." *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 457 (6th Cir. 2008) (quoting *Williams v. Missouri Dep't of Mental Health*, 407 F.3d 972, 977 (8th Cir. 2005)).  The Sixth Circuit has made limited exceptions to this rule where employees delay reporting harassment in the face of credible threats of termination.  *See Wyatt*, 999 F.3d at 416.  Harris, however, has made no such allegations here.  Instead, she merely asserts that she knew based on Wilbourn's experience that complaining would be futile.  She cites no caselaw in support of her argument on the second element and does not point to any evidence suggesting that any complaints she made about Noel also would fall on deaf ears.

- 21 -

The record establishes that Harris had no credible reasons for her delay in reporting the alleged harassment.  Although MotorCity satisfied the second element of the affirmative defense as a matter of law, fact questions preclude a similar finding on the first element.  MotorCity "loses the affirmative defense if it fails either prong" of the *Faragher-Ellerth* framework.  *Wyatt*, 999 F.3d at 413.  At the summary judgment stage, the affirmative defense will not preclude liability if there are fact questions on either element.  MotorCity therefore is not entitled to summary judgment on Harris's Title VII supervisor liability claim.

## 2.  Coworker Liability

Harris argues in the alternative that she can establish her Title VII claim under a co-worker harassment theory.  An employer is liable for co-worker harassment if its "response to the plaintiff's complaints 'manifest[ed] indifference or unreasonableness in light of the facts the employer knew or should have known.'"  *Waldo v. Consumers Energy Co*., 726 F.3d 802, 814 (6th Cir. 2013) (quoting *Hawkins v. Anheuser-Busch, Inc*., 517 F.3d 321, 338 (6th Cir. 2008)). "Generally, a response is adequate if it is reasonably calculated to end the harassment."  *Jackson v. Quanex Corp*., 191 F.3d 647, 659 (6th Cir. 1999).  "Steps that would 'establish a base level of reasonably appropriate corrective action' may include promptly initiating an investigation to determine the factual basis for the complaint, 'speaking with the specific individuals identified by [the complainant], following up with [the complainant] regarding whether the harassment was continuing, and reporting the harassment to others in management.'"  *Waldo*, 726 F.3d at 814 (quoting *West v. Tyson Foods, Inc*., 374 F. App'x 624, 633 (6th Cir. 2010)).

Harris has put forth sufficient evidence to survive summary judgment under this theory of liability.  The record, viewed in the light most favorable to Harris, establishes that MotorCity had constructive notice of Noel's conduct when Harris talked to Signature Lounge supervisor Jamie

- 22 -

Brinkman about it and when Wilbourn reported alleged harassment to Kim Morgan and executive host J.P.  *See Wyatt*, 999 F.3d at 417; *Waldo*, 726 F.3d at 816.  A reasonable jury could conclude from the evidence that MotorCity at that point "failed to take promptly a number of steps that would be necessary to 'establish a base level of reasonably appropriate corrective action,'" such as Brinkman and Morgan escalating the issue to HR, and HR following up with Harris and Wilbourn regarding whether the harassment was still continuing.  *See Wyatt*, 999 F.3d at 417 (quoting *West*, 374 F. App'x at 633).  The fact that MotorCity immediately launched an investigation following Harris's February 2020 complaint "does not excuse its dilatoriness" if supervisors received earlier complaints regarding Noel.  *Ibid.*  Harris has established genuine issues of material fact concerning the reasonableness of MotorCity's response.

### B.  Battery Claim

Harris brought a claim against defendant Noel for battery under state law.  The defendants argue that this claim should be dismissed because there is no evidence that Noel touched her willfully or harmfully.  They contend that Harris's decision to take a smoke break with Noel after the alleged incident undercuts Harris's version of events, as do the results of JoAnn Taylor's investigation.

To establish a viable claim for battery, the plaintiff must demonstrate a "willful and harmful or offensive touching of another person which results from an act intended to cause such a contact." *Espinoza v. Thomas,* 189 Mich. App. 110, 119, 472 N.W.2d 16, 21 (1991) (citing *Tinkler v. Richter,* 295 Mich. 396, 295 N.W. 201, 203 (1940)).  Fact questions preclude summary judgment on the battery claim.  Harris's testimony establishes that Noel grabbed her breast in a way she understood to be willful, while Noel disputes touching Harris's breast at all.  Noel further testified

that if he did touch Harris's breast, he did so accidentally, without any intent to do so or to cause harm.

After thoroughly investigating the incident, JoAnn Taylor concluded that Noel's explanation was credible and that any touching that occurred likely was accidental. Because there were no eyewitnesses to the event, the only way to resolve the factual disputes of whether and why Noel grabbed Harris is by assessing Noel's and Harris's respective credibility. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

The defendants are not entitled to summary judgment on this count.

### C. Intentional Infliction of Emotional Distress Claim

"To establish a prima facie claim of intentional infliction of emotional distress, the plaintiff must present evidence of (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Lucas v. Awaad*, 299 Mich. App. 345, 359, 830 N.W.2d 141, 150 (2013) (quoting *Dalley v. Dykema Gossett*, 287 Mich. App. 296, 321, 788 N.W.2d 679, 694 (2010)). "Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Ibid*. (quoting *Doe v. Mills*, 212 Mich. App. 73, 91, 536 N.W.2d 824, 833 (1995)).

The defendants contend that Noel's alleged conduct of grabbing Harris's breast was not so outrageous in character and extreme in degree as to support a claim for intentional infliction of emotional distress. Harris disagrees, arguing that grabbing someone's breast is conduct so

outrageous and extreme that it goes "beyond all possible bounds of decency." *Awaad*, 299 Mich. App. at 359, 830 N.W.2d at 150.

The Michigan Court of Appeals recently considered precisely this question in *Swain v. Morse*, 332 Mich. App. 510, 957 N.W.2d 396 (2020), a factually-analogous case. There, a diner at a restaurant alleged that another customer grabbed and squeezed her breast while she was attempting to take a "selfie" photograph with him. *Id.* at 514, 957 N.W.2d at 401 (2020). Reasoning that "unwanted sexual touching is typically regarded as more extreme conduct" and "an average member of today's community could find the alleged conduct . . . outrageous," the court of appeals concluded that the trial court erred by granting summary disposition on the diner's intentional infliction of emotional distress claim. *Id.* at 537, 957 N.W.2d at 412. The court acknowledged "that community standards regarding sexual misconduct have changed significantly over the past few years," creating a question for the jury as to whether "a single touch to the breast through clothing meets the IIED threshold." *Id.* at 536, 957 N.W.2d at 412.

Harris alleges that Noel grabbed and squeezed her breast a single time. Following *Swain*, we must conclude that "reasonable minds may differ as to whether the alleged conduct was extreme and outrageous." 332 Mich. App. at 537, 957 N.W.2d at 412.

The defendants argue that Harris's allegations are materially different from the facts in *Swain*. They point out that in *Swain*, the court found relevant the fact that the plaintiff had just met her assaulter. But that fact was not determinative in the finding of outrageousness. *Swain*, 332 Mich. App. at 536, 957 N.W.2d at 412. To the contrary, the court of appeals found that certain factors weighed for and against a finding of outrageousness. *Ibid.* The same is true here. Reasonable individuals could reach different conclusions on whether Harris's long working relationship with Noel and the location of the assault made Noel's alleged behavior more or less

"brash and unexpected." *Ibid*. The more important point is that Harris alleges "unwanted sexual contact" of the sort that the *Swain* court found generally to be "more extreme" than other kinds of conduct that meets the intentional infliction of emotional distress threshold. *Ibid.* That some factors "suggest that the conduct . . . fails to meet the high threshold for IIED," while other factors suggest the opposite, precisely is why summary judgment is unwarranted here. *See ibid.*

The record here presents "a factual question for the jury to resolve as to whether the plaintiff[] [is] entitled to recover on the basis of [her] IIED claim." *See ibid.*; *Hayley v. Allstate Ins. Co.*, 262 Mich. App. 571, 577, 686 N.W.2d 273, 277 (2004) ("But where reasonable individuals may differ, it is for the jury to determine if the conduct was so extreme and outrageous as to permit recovery."). The defendants are not entitled to summary judgment on this claim.

III.

The record establishes questions of material fact that preclude summary judgment for the defendants on all counts of the amended complaint.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment (ECF No. 27) is **DENIED**.

It is further **ORDERED** that counsel for the parties appear before the Court **on October 12, 2022 at 10:00 a.m.** for a status conference to discuss further case management deadlines.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  September 29, 2022